WELLS, Judge.
Ross Dress for Less Virginia, Inc., and U.S. Security Associates, Inc., seek certio-rari relief from an order holding them in contempt and sanctioning them for discovery violations by imposing a $200 a day fine; striking their pleadings; entering a default against them; and allowing an amendment to the complaint against them to include “by interlineation” a claim for punitive damages. On the analysis outlined below, we grant the petition and quash the order under review in its entirety. Additionally we note what transpired here was a textbook case of the tail wagging the dog. Relying on the solitary uncorroborated comment of a single non-party, Respondents’ counsel, employing hyperbole and declared outrage, set out on a quest to collect hundreds of apprehension reports, continuing even when Petitioners swore under oath that they had handed over all such reports in their possession, leaving unanswered the real issues before the court, as counsel chased the non-existent and irrelevant.
The Facts
This case arises from an incident that occurred on July 13, 2006. On that day, Rodolfo Castro and his son were shopping at the Miracle Mile Ross Dress for Less located in Coral Gables, Florida, when they were apprehended by police, after Victor Soca, a U.S. Security employee, alerted authorities that he suspected the two of shoplifting. At the time, U.S. Security had been providing security services to the Miracle Mile store for only forty-five days. After Castro and his son were apprehended, they were transported to the police department where Castro Sr. was charged with retail theft, a charge that was later nolle prossed. The charge against his son also was later dropped.
Thereafter, on March 7, 2007, Castro and his son, claiming that they were wrongfully stopped and accused of stealing merchandise, sued Ross and U.S. Security for false imprisonment, malicious prosecution, and slander[1]:
Although merely shopping around in the store, the Plaintiffs, however, were shockingly accosted by a representative of the Defendant (one “Victor Soca”-U.S. SECURITY’S and/or ROSS loss prevention manager and/or an individual authorized to act on behalf of the Defen *514 dants) who called them thieves and falsely accused them of allegedly offering some unknown person money and a pair of pliers to facilitate theft of merchandise (allegedly valued at $77.91). At all times material hereto, Victor Sosa [sic] and any other employee, agent or representative of the Defendants were acting in the course and scope of their employment and in furtherance of the Defendant, ROSS’ business interests thereby rendering Defendant, ROSS jointly, severally and vicariously liable for all damages caused by, or resulting from, the acts or omissions of U.S. SECURITY, and co-Defendant U.S. SECURITY is independently liable for the acts of its own agents/employees/representatives.
The Castros simultaneously propounded interrogatories and a request for production to Ross seeking, among other things, production of Ross’s policy manuals and procedures and guidelines regarding apprehension, detention, treatment and handling of shoplifters. The Castros also sought all documents related to the Cast-ros’ arrest and detention and any other lawsuit lodged against Ross for false arrest, defamation, malicious prosecution, assault, and negligent hiring, training, supervision,, and retention. No specific request was made for “incident” or “apprehension reports” relating to anyone other than the Castros.
Ross, as authorized by the rules of procedure, filed objections to these requests claiming, among other things that some of the documents sought were protected by the attorney-client privilege while others were in the possession of U.S. Security, the entity that actually handled its security.[2] The Castros moved to compel the discovery sought and made the first of increasingly shrill accusations of wrongdoing to secure an order striking Ross’s pleadings as a sanction for asserting authorized objections:
12. Thus, despite Plaintiff propounding formal discovery upon the Defendant directly relating to the events giving rise to this action, The Defendant remarkably has refused to respond appropriately and has thus interrupted the orderly and proper progression of this proceeding and hindered the truth finding process (to be sure, it is unfathomable and remarkable that the Defendant refuses to even state its version of the events despite the fact that it has raised a number of purported affirmative defenses — one of which is the allegation that it had probable cause for it’s [sic] action).
13. Under the circumstances, the Plaintiffs are entitled to an order compelling Defendant to fully and accurately respond to the outstanding and overdue discovery request and/or striking of Defendant’s pleading/affirmative defenses as it appears as same cannot be supported by the Defendant and/or their [sic] were raised without any good faith bases. Cf, Section 57.105, Fla. Stat.
On August 28, 2007, Judge Maria Espi-nosa Dennis, the first of four judges assigned to date to this case, ordered Ross to produce its policy and procedures manuals as well as a number of other documents. The court did not, however, either order production of any incident or apprehension reports or sanction Ross in any way.
Over a year later, in October of 2008, Victor Soca, the U.S. Security employee actually involved in the Castros’ apprehen *515 sion was deposed. During that deposition, Soca testified that he had been a part-time employee at U.S. Security from 2002 to 2007, working only two days a week at different businesses for which U.S. Security provided services. Soca also testified as to his observations of the Castro family on the day in question and produced the documents in his possession relating to their apprehension. Those documents were comprised of three apprehension reports consisting of six pages each detailing his observations and listing the items that he concluded the Castros were attempting to steal.
While producing these documents, Soca, who at the time had been employed by U.S. Security for approximately four years, represented that he kept copies of incident reports relating to all of the apprehensions in which he was involved:
No, no, I always keep copies. Oh, I got files going back in Sear[s], Publix. You know, like I’ve got a library that you walk in. It’s like a loss library. I’ve got them alphabetically, you know. You tell me — I have them categories [sic] by Publix, Wal-Mart, Sears, Ross.... So I go back and research it.
Soca also testified that during the time he worked at the Miracle Mile Ross store,[3] he was aware that “sometimes” as many as “ten, twelve, twenty people a day” were being apprehended.
Five months after Soca’s deposition was taken, in March of 2009, the Castros served a subpoena duces tecum on Soca — a non-party — seeking production of all incident reports in Soca’s “control or possession generated, created or written by [Soca], in regards to any arrest, detention, apprehension or incidents relating to theft that took place while [Soca was] employed by U.S. Security.” No similar request was made of either U.S. Security or Ross.
When Soca did not comply with the subpoena, the Castros moved to compel production and sought sanctions in the form of a fee award against him. U.S. Security, Soca’s employer, claiming to be the rightful owner of the requested documents, moved for a protective order on the grounds that the requested documents were protected by the work product privilege. On July 8, 2009, Judge Maxine Cohen Lando, the second judge assigned to this matter, ordered both Ross and U.S. Security, within ten days, to gather all documents responsive to the subpoena served on Soca and to submit a detailed privilege log referencing any item claimed to be work product. Although no motion for sanctions had been asserted against U.S. Security or Ross, the court below reserved ruling on the imposition of sanctions “against the Defendants and Victor Soca” and set a follow-up hearing for July 14, to determine whether Ross and U.S. Security had complied with her order and whether any of the documents gathered constituted work product materials.
Within two days, U.S. Security and Ross served their privilege log. That privilege log spanned a period of time from 2003 to 2008 — the period during which Soca had been employed by U.S. Security — and listed by date, seventy six different incident/apprehension reports in which Soca was involved. Of those seventy six incidents, all but two occurred at grocery stores at which Soca worked. This amounted to approximately fifteen apprehensions a year, barely more than one a month, and did not come close to supporting a conclusion that Soca ever made anything close to ten, twelve or twenty apprehensions a day.
*516 In a memorandum of law accompanying this privilege log, U.S. Security and Ross re-asserted their claim that all of these documents were protected by the work product privilege and supported that contention with the affidavit of Kirk Gatchell, U.S. Security’s the regional manager, who attested that the listed incident/apprehension reports were prepared by U.S. Security employees “in anticipation of litigation.” Gatchell further attested that such documentation was retained by U.S. Security for only five years absent pending litigation.
On July 14, the court below revisited the Castros’ motion to compel and for sanctions and U.S. Security’s and Ross’s motion for protective order. This time, the court orally ordered[4] U.S. Security and Ross to gather all documents responsive to the Castros’ subpoena within ten days and to file those documents with the court for an in camera review. The court again ordered U.S. Security and Ross to submit a detailed privilege log listing any item claimed to be work product and reserved jurisdiction to consider imposition of sanctions against Soca, U.S. Security, and Ross.
One week later, on July 21, U.S. Security timely filed with the trial court for in camera inspection the seventy six documents which it had previously listed in its privilege log as being responsive to the subpoena served on Soca. On September 9, 2009, Judge Cohen Lando granted U.S. Security’s and Ross’s motion for protective order, relieving them of any obligation to produce the documents listed on their privilege log and produced for in camera inspection.
The court then, in that same order, inconsistently denied the motion for protec-five order for the exact same documents in Soca’s possession:
ORDERED AND ADJUDGED that Defendant’s Motion for Protective Order is GRANTED for the incident reports identified in Defendant’s July 21, 2009 Notice of Filing Incident Reports for In Camera Inspection.
IT IS FURTHER ORDERED AND ADJUDGED that Defendant’s Motion for Protective order is DENIED regarding any incident reports in the possession, custody or control of Victor Soca.
Two days later, on September 11, 2009, Judge Cohen Lando entered a wholly contradictory order denying the exact same relief granted to Defendants two days before, this time granting the Castros’ motion to compel U.S. Security and Ross to produce documents not only in Soca’s possession but also in their possession:
ORDERS AND ADJUDGES that Plaintiffs motion to compel discovery is GRANTED.
IT IS ORDERED AND FURTHER ADJUDGED that Defendant’s motion for Protective Order is DENIED regarding any incident reports referenced in Plaintiffs subpoena and which are in the care, custody, control or possession of Victor Soca and or the Defendants. All documents shall be forthwith delivered to Plaintiffs counsel.
(Emphasis added).
No sanctions were imposed at that time.
Six days after this last order, on September 17, the Castros moved to hold both Ross and U.S. Security in contempt and to impose “severe sanctions” against them because they had not produced documents purportedly in Soca’s possession. This motion was premised on the legally incorrect assumption that U.S. Security and Ross had control over the documents in *517 Soca’s possession because they had asserted their work product privilege in response to the subpoena served on Soca:
Defendants [are] being wholly uncandid and disingenuous with the Court in claiming that they allegedly do not keep such records, the Defendants have control over the documents that are separately maintained by Victor Soca as they would not otherwise would/could have filed an objection to a third party subpoena (to be sure, the Court even remarked at one of the hearings on the same fact).
(Emphasis added).[5]
The Castros’ motion asserted as a basis for imposing “severe sanctions” that U.S. Security, Ross and Soca had acted in bad faith because: (1) Soca, U.S. Security and Ross had tried to prevent the Castros from serving a subpoena on Soca to secure the documents he had testified about in his deposition by providing a “false address”[6]; (2) the Castros’ lawyer had contacted Soca directly who “shockingly” advised that U.S. Security’s and Ross’s attorney also represented him and had advised him not to produce documents[7]; and (3) Soca, U.S. Security and Ross had “intentionally mislead” the trial court by claiming that the requested documents were privileged and related to irrelevant slip and fall incidents.[8]
U.S. Security and Ross responded to this motion advising the court below that Soca had provided his address at his deposition and that they had provided no “false” address for him. They also confirmed that they had properly asserted their objections to the production requested and following the July 14 hearing they had produced all of the documents that they had responsive to the Castros’ subpoena which consisted of “over 70 incident reports prepared by Mr. Soca.” (Emphasis added). U.S. Security and Ross also denied that they mislead the court because the reports produced, while mostly concerning incidents at a Publix Supermarket, were apprehension, not slip and fall reports.
With regard to Soca’s failure to produce documents, U.S. Security and Ross denied that their counsel ever advised Soca not to comply with the trial court’s order and claimed to the contrary, that their attorney had contacted Soca to secure his cooperation in producing the incident reports or *518 dered, but that Soca “expressed concern in producing the incident reports he authored based upon the confidential information contained therein.” U.S. Security and Ross further advised that Soca had filed a response with the court raising his concerns about producing documents relating to incidents at other entities, such as Wal-Mart, and about producing documents detailing the personal information, such as the dates of birth and Social Security numbers, of third persons.
On April 27, 2010, U.S. Security and Ross provided to the trial court, for an in camera inspection, the documents that they had received from Soca which purportedly responded to the Castros’ subpoena. Two days later, they filed two versions of a privilege log (one listing documents as they were received, one listing documents by date) of “documents from the files of Victor Soca,” asserting “that each and every one of these documents is protected by the work product privilege.” That log listed 105 reports prepared by Soca spanning a period from early 2004 to 2008. This amounts to a little over twenty six reports a year or a little more than two per month and again, all but two of these reports involved incidents at a grocery store. This log was reinforced by a memorandum of law supporting U.S. Security’s and Ross’s claim that the documents were prepared in anticipation of litigation and thus protected by the work product privilege.
On August 5, 2010, the Castros’ September 17, 2009 motion for contempt and severe sanctions was heard. At that time, the trial court granted the Castros’ motion and ordered U.S. Security and Ross to provide all apprehension reports for the Ross Miracle Mile store for a year before the Castros’ apprehension until six months after. No sanctions were awarded against either defendant.
Eight days later, Kirk Gatchell, U.S. Security’s regional manager, filed an affidavit in which he represented that U.S. Security had provided services to the Miracle Mile Ross store for only forty-five days commencing on May 31, 2006, and thus there were no apprehension reports for the Miracle Mile store prior to that date. He also represented that when U.S. Security produced documents in July of 2009, it produced “what [it] believe[d] to be all apprehension reports initiated by Victor Soca” but since that time it had discovered six more such reports which had been misfiled by a former employee. These additional six reports were turned over to the court. The following day, Ross filed the affidavit of the director of its loss prevention department, who stated that “pursuant to its procedures, Ross does not maintain nor have in its possession Apprehension Reports from prior to 2008 for the Miracle Mile Store.”
On August 18, 2010, Ross and U.S. Security sought certiorari review in this court, maintaining that the reports at issue were work product. Certiorari was denied on March 2, 2011. See Ross Dress for Less Virginia, Inc. v. Castro, 56 So.3d 781 (Fla. 3d DCA 2011).
On April 21, 2011, the Castros filed an unsworn motion for contempt and “severe sanctions” seeking to strike U.S. Security and Ross’s pleadings, for entry of a default against both U.S. Security and Ross, and to allow an amendment to their complaint to add a claim by interlineation for punitive damages for allegedly committing fraud upon the court and/or destroying or concealing court ordered documents. At the heart of this motion was the Castros’ claim that “because U.S. Security and Ross [and Soca] ultimately produced only a handful of apprehension reports prepared by Soca” when compared to “Soca’s deposition that sometimes he made as *519 many as twenty apprehensions a day,” it [was] “abundantly ... clear that the Defendants have continued ... not to be ‘forthright’ and continue instead with their calculated attempt to commit further fraud upon the Court .... ”
This demand was further “supported” by the following allegations asserted as though they were established facts:
1. That this action arose from “knowingly” “false” accusations of Victor Sosa regarding the Castros’ conduct which resulted in their “false” arrest, “defamatory” allegations of theft being made against them and their “subsequent malicious prosecution”;
2. That Soca’s October 2008 deposition proved that Soca, U.S. Security and Ross had falsely, maliciously and deliberately fabricated[9] the charges against the Castros and that U.S. Security and Ross knew that they were false and were covering up their wrongdoing;
3. That not only Soca but also U.S. Security and Ross had provided a “false” address for Soca because when the Castros’ attempted to serve Soca with a subpoena duces tecum at the address which he had provided at his deposition, it turned out to be “outdated”;
4. That U.S. Security and Ross were guilty of “bad faith and [an] ongoing attempt to hamper the fact finding process and hide critical evidence” because they asserted their work product objections to production of documents;
5. That when Soca appeared before the court below and expressed his concerns about providing unredacted documents in his possession, Cast-ros’ counsel was shocked;
6. That U.S. Security and Ross had hidden or destroyed documents brought to court by Soca on April 17, 2010, because no one knows what they did with the documents after they took possession of them from a copy service for the purpose of making a court ordered comparison of those documents with documents they had previously provided;
7. That U.S. Security and Ross had done “everything possible under the sun ... to hide the documents that the Court (repeatedly) ordered to be produced, or claim that they allegedly do not exist (notwithstanding Victor Soca’s own sworn deposition testimony and the fact that the large binder that he came to court with was several inches thick ....)”
U.S. Security and Ross responded to these allegations citing to the record to contradict each and every one. As part of that response, they confirmed that in full compliance with the trial court’s July 8, and August 17, 2009 orders, they had turned over for in camera inspection those incident reports in their possession that had been created by Soca and, with one exception, those reports related to Soca’s work at a local grocery store. U.S. Security and Ross further confirmed that on April 17, 2010, Soca had appeared before the court and produced the documents in his possession and that on April 29, U.S. Security and Ross had provided the trial court with “a complete copy of the records provided by Mr. Soca and two versions of a privilege log.” Finally* U.S. Security and Ross advised the court that pursuant *520 to the court’s August 5, 2010 order to provide all apprehension reports at the Ross Miracle Mile store and not just those prepared by Soca, they had gathered the documents and had provided them to the court.[10]
With regard to the Castros’ claim that U.S. Security and Ross had to be hiding or destroying documents based on Soca’s deposition testimony that during his tenure at the Miracle Mile Ross store he was aware that “sometimes” “ten, twelve, twenty people a day” were apprehended, U.S. Security and Ross advised the court below that for the period between May 2005 and January 2007, certain records showed a total of twenty one apprehensions at the Miracle Mile store, most of which were made by someone other than Soca. For the period between the end of May 2006 and the middle of January 2007, other records indicated twenty two apprehensions and Coral Gables Police Department records indicated twenty seven such incidents. Thus, while Defendants conceded these numbers did not “match up 100%,” and they may have been guilty of “bad record keeping,” they had “[n]o hidden agenda,” and the figures in no way reflected Soca’s earlier guesstimates. In sum, while internal records were somewhat contradictory as to the exact number of apprehensions made for the time period in question, there was no evidence of thousands or even hundreds of missing, hidden or destroyed reports.
On June 16, 2011, a hearing was held on the Castros’ motion to compel and for severe sanctions. During that hearing, U.S. Security and Ross were orally ordered to provide the Castros with Soca’s documents (which had previously been filed with the court) after they were redacted. Following a discussion as to whether Soca’s testimony regarding up to twenty apprehensions on some days was accurate, the trial court stated:
THE COURT: Well, I want to have a hearing. I want to have an evidentiary hearing. And I’m giving you a heads-up. I’m going to be looking for answers to those questions.
I am not satisfied. There have been allegations of fraud. I don’t know if I would call it fraud, but it could be construed destruction of evidence. And that’s what I’m really concerned about is whether evidence is destroyed, whether it’s being deliberately withheld, or whether there was some issue concerning the intent not to follow the court’s order.
Am I being clear on that?
One week after this hearing, all of the apprehension reports retained by Soca were provided to the Castros. A little over a week after that, all records in U.S. Security’s and Ross’s possession were produced.
Almost a year later, on June 4, 2012, the hearing ordered by Judge Cohen Lando was commenced by Judge Victoria Platzer, the third judge assigned to this case. At that hearing the loss prevention director for Ross testified without contradiction that Ross neither prepared nor kept incident or apprehension reports. This witness also testified that Ross relied solely on U.S. Security to make and keep such documents and did not receive or retain them. Significantly, this witness confirmed that while it did not receive or retain actual apprehension reports, it did receive a monthly status report of the number of apprehensions that had been *521 made at its over 220 stores and that on average only two to four apprehensions were made a week.[11]
The loss prevention director from U.S. Security also testified at this hearing and unequivocally rejected Soca’s statement that sometimes ten, twelve, or twenty apprehensions a day were being made at the Miracle Mile Ross store. To the contrary, he testified that during the period in which U.S. Security provided security at that store, the apprehension reports that it received evidenced that only two to four apprehensions were being made per week. While admitting that U.S. Security had not done a good job in managing its documents or in locating those requested, it reconfirmed that it had turned over everything that it could find, including six reports that it discovered in the desk drawer of an employee who had been laid off.
The court below rejected this testimony, awarding fees and costs to the Castros “incurred since 2008” from both Ross and U.S. Security and sanctioned them by allowing the Castros to provide the jury with a spoliation instruction:
The Plaintiffs are entitled to recoup all costs and fees incurred since 2008 from the Defendants associated with litigating any of the issues and compelling compliance/seeking sanctions ... The Court shall provide the jury with a spoliation instruction concerning Defendants’ willful and deliberate failures to turn over the highly critical apprehension reports notwithstanding clearly being ordered to do so by the Court, from which the jury can make or reach any reasonable adverse inference towards the Defendants... the Defendants shall turn over to the Plaintiffs each and every document relating or referring to Victor Soca, particularly his entire personnel employment file-records, including, but not limited to, any complaints or grievance made against him, any employment applications, background searches, all work schedules, time cards, pay records, and disciplinary record... [and] In addition to amending their complaint to assert any additional counts against the Defendants (e.g., spoliation of evidence, or negligent retention/supervision, etc.), the Plaintiffs may file a revised motion for leave to assert a claim — for punitive damages (which the Court will reconsider at a subsequent hearing in light of the forgoing).
(Emphasis added).
Additionally, the trial court warned:
Any further disregard by the Defendants of the Court’s orders or further acts reflecting concealment/destruction of documents, fraud, dishonesty, perjury or lack of candor by any of the Defendants, shall result in the striking of their pleadings and entering of defaults in favor of the Plaintiffs, along with other appropriate sanctions.
On January 11, 2013, the Castros, repeating the representations made in their April 21, 2011 motion filed yet another motion to strike U.S. Security’s and Ross’s pleadings, for entry of default against them, and for permission to add a punitive damage claim and for other relief.
On February 28, 2013, defendants filed a Notice of Compliance. Attached to that notice were copies of the previously disclosed apprehension reports which had been prepared by Soca for the period spanning November 2003 through May of *522 2008. The notice also attached nine apprehension reports (also previously disclosed) which had been prepared by other U.S. Security personnel at the Miracle Mile store. Of these eighty eight apprehension reports provided, only nineteen were generated at that Miracle Mile store.
In addition to these documents, U.S. Security and Ross attached an additional seventy three apprehension reports which were in its possession for that same period — all of which related to incidents at Publix Supermarkets. In sum, approximately 160 apprehension reports spanning a period of over four years were provided.
On May 3, 2013, Judge Rosa Rodriguez, the fourth judge assigned to this case, relying primarily on the orders of three earlier judges (and following a hearing comprised of only twenty-three pages), granted the Castros’ motion and struck U.S. Security’s and Ross’s pleadings, entered default against them, allowed the Castros to amend to add a claim for punitive damages and assessed a $200 per day fine against them until they produced all documents purportedly in their possession:
This Court finds and concludes that the Defendants, once again, willfully, deliberately, contumaciously and in bad faith disregarded the Court’s clear and specific directives and order; despite even being found in contempt of Court, the Defendants continued to exhibit a deliberate and willful disregard of the Court’s authority and directives. Accordingly, the plaintiffs are entitled to the requests sought and the Defendants subject to the severest sanctions possible[.] The Court thus:
1. Strikes the Defendants’ pleadings and enters defaults against them; although the Court is well aware that the striking of pleadings and entry of default is the most severe sanction available and must be commensurate with the violation, the record here is rife with Defendants’ willful, bad faith, and contumacious disregard of court orders;
2. Grants leave to the Plaintiffs and the complaint is hereby deemed amended by interlineation to include claims for punitive damages against the Defendants;
[[Image here]]
5. The Court also hereby imposes a $200 a day monetary sanctions (to commence on April 29, 2013) against each individual Defendant to be paid to the Plaintiffs until there is full compliance with the Court’s outstanding directives.
U.S. Security and Ross seek certiorari review of this order which we grant because the order departs from the essential requirements of the law in ways that will result in irreparable harm not correctable on direct appeal. See Boby Express Co. v. Guerin, 930 So.2d 842, 843 (Fla. 3d DCA 2006) (“The applicable standard of review is whether the challenged order (1) constitutes a departure from the essential requirements of the law; (2) causes material injury throughout the remainder of the proceedings below; and (3) causes injury that is irreparable, as it effectively leaves no adequate remedy at law.”).
1. The daily monetary fine for failure to comply with outstanding directives
We review the instant order imposing a $200 a day fine pending compliance with the trial court’s outstanding directives as a prejudgment civil contempt order subject to certiorari review. See Knorr v. Knorr, 751 So.2d 64, 65 (Fla. 2d DCA 1999) (concluding that “prejudgment civil contempt orders are ... properly reviewed by certiorari”); see also Pugliese v. Pugliese, 347 So.2d 422, 424 (Fla.1977) *523 (stating that “[i]f the purpose of the proceedings is to coerce action or non-action by a party, the order of contempt is characterized as civil”); Dep’t of Children & Families v. R.H., 819 So.2d 858, 861 (Fla. 5th DCA 2002) (“Because a civil contempt proceeding is remedial in nature, its primary purpose is to obtain compliance with a court order by the person subject to the order. See Shook v. Alter, 729 So.2d 527 (Fla. 4th DCA 1999)”).
It is well established that a party cannot be sanctioned for contempt for violating a court directive or order which is not clear and definite as to how a party is to comply with the court’s command. Northstar Inves. & Dev., Inc. v. Pobaco, Inc., 691 So.2d 565, 566 (Fla. 5th DCA 1997) (“A party may not be held in contempt of court for violation of an order ... which is not clear and definite so as to make the party aware of its command and direction.”); Lawrence v. Lawrence, 384 So.2d 279, 280 (Fla. 4th DCA 1980) (“One may not be held in contempt of court for violation of an order or a provision of a judgment which is not clear and definite so as to make the party aware of its command and direction.”); see also Miranda v. Miranda, 566 So.2d 16, 18 (Fla. 4th DCA 1990) (quoting Kranis v. Kranis, 313 So.2d 135 (Fla. 3d DCA 1975) for the proposition that a party should not be held in contempt for violation of an order which is not clear and definite as to how the party is to act to come into compliance). As our sister court recently confirmed:
“[T]he law ... imposes upon the court the requirement to be explicit and precise in its commands if strict compliance is to be exacted in the form of a contempt citation.”
Reder v. Miller, 102 So.3d 742, 743 (Fla. 2d DCA 2012) (quoting Cooley v. Moody, 884 So.2d 148,145 (Fla. 2d DCA 2004)).
The order imposing daily monetary sanctions on U.S. Security and Ross for contempt of court does not comply with this mandate. While the order does reference a number of prior orders directing U.S. Security and Ross to act, it does not state precisely what U.S. Security and Ross are now to do to come into “full compliance with the Court’s outstanding directives.” This is especially troubling in light of the number of different and conflicting directives previously issued by the court below regarding the production of documents.
Even more troubling is the unre-butted testimony from both U.S. Security and Ross that they have no ability to further comply with the court’s many directives. As the Florida Supreme Court long ago confirmed, where a party is being sanctioned for civil contempt for failing to abide by a court order, that person must “carr[y] the key to his cell in his own pocket.” Pugliese, 347 So.2d at 424; see Parisi v. Broward County, 769 So.2d 359, 365 (Fla.2000) (“[T]he key safeguard in civil contempt proceedings is a finding by the trial court that the contemnor has the ability to purge the contempt.”); R.H., 819 So.2d at 862 (same). Put another way, a party held in civil contempt and ordered to comply with a court order must be able to do so — -that is, the party must have the ability to comply. No such showing has been made here.
Despite Soca’s statement in 2008 that he was aware that “sometimes” between ten and twenty apprehensions were being made a day at the Ross store, nothing in the record demonstrates this to be true. More to the point, nothing in the record demonstrates that any documents exist to support that statement. Neither U.S. Security’s nor Ross’s documents support such a claim, and the documents produced by Soca from his “library” come nowhere *524 close to confirming this statement. Nor do the records of apprehensions from any other place where Soca worked while at U.S. Security. The record simply does not establish that more records exist to be provided.
In Beck’s Transfer, Inc. v. Peairs, 532 So.2d 1136, 1137 (Fla. 4th DCA 1988), the court confirmed that a contempt order premised on a failure to produce documents represented early on in the action to exist but later represented not to exist, will not support a contempt order absent some competent evidence — not just pleadings and argument — to show that documents actually exist:
It appears the trial court relied heavily upon appellants’ early representations concerning the existence of the records and concluded that the documents did exist despite appellants’ later representations to the contrary. Appellee did not present any competent evidence to establish that the ... records furnished by appellants did not comply with the court’s previous order, and no evidence that the documents did in fact exist. Appellants asserted in their response to appellee’s motion for sanctions that it had complied with appellee’s request to produce and also claimed that they did not have copies of the [documents].... Appellee’s pleadings and argument did not constitute evidence.
The same rationale applies here.
The only evidence of U.S. Security’s and Ross’s ability to produce more documents of any kind other than those already produced comes from the sworn testimony of their representatives who testified, without contradiction, that they had no further ability to comply. Against this competent substantial evidence, neither speculation by Castros’ counsel that it is “logical” that more documents exist nor the trial court’s assumption that more documents must exist because these parties “must be getting sued all over the place for detaining people and not keeping records,” will support the order entered below holding these parties in contempt and fining them daily for failing to comply with unspecified directives to produce more documents.
A motion for leave to amend a pleading to assert a claim for punitive damages shall make a reasonable showing, by evidence in the record or evidence to be proffered by the claimant, that provides a reasonable basis for recovery of such damages. The motion to amend can be filed separately and before the supporting evidence or prof *525 fer, but each shall be served on all parties at least 20 days before the hearing.
*524 Because the order on review fails to clearly and definitively state which directives U.S. Security and Ross are to satisfy and because the record does not demonstrate that they have the ability to comply with any order mandating production of additional documents, that portion of the order imposing a $200 a day fine until more documents are produced is quashed.
2. The amendment to allow a claim for punitive damages
Section 768.72 of the Florida Statutes creates a “substantive legal right” not to be subject to a punitive damages claim until the trial court makes a determination that there is a reasonable evidentiary basis for recovery of punitive damages. Simeon, Inc. v. Cox, 671 So.2d 158, 160 (Fla.1996); Globe Newspaper Co. v. King, 658 So.2d 518, 519 (Fla.1995). Thus, section 768.72(1) provides “[i]n any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages.”[12]
*525 This Court reviews an order granting a motion to amend to include a claim for punitive damages solely to determine whether the trial court conformed with the procedural requirements of section 768.72, in making the required evidentiary determination. As Globe, 658 So.2d at 519, explains:
We conclude that appellate courts do have certiorari jurisdiction to review whether a trial judge has conformed with the procedural requirements of section 768.72, but do not have certiorari jurisdiction to review a decision of a trial judge granting leave to amend a complaint to include a claim for punitive damages when the trial judge has followed the procedural requirements of section 768.72. Certiorari is not available to review a determination that there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages.
See Simeon, 671 So.2d at 160 (“[Ajppellate courts should grant certiorari in instances in which there is a demonstration by a petitioner that the procedures of section 768.72 have not been followed.”).
The instant motion to amend was granted as a sanction for Defendants’ purported “willful disregard of the Court’s authority and directives” not from a determination that there was a reasonable evidentiary basis for recovery of punitive damages, as required by section 768.72. The question of evidentiary support for the amendment sought was not even broached at the short April 29, 2013 hearing which precipitated the court’s May 3rd ruling. The Castros did not present any evidence, nor did they proffer how any yet unproduced reports would provide the statutorily required evi-dentiary support for a punitive damages claim.'
Instead, the entire hearing addressed whether the sanctions sought, including leave to amend to state a claim for punitive damages, should be granted. The court questioned defense counsel as to how she refuted the Castros’ January 11, 2013 twenty-one page, seventy-seven paragraph sanctions motion which included the request for leave to seek punitive damages. However, neither that motion nor the hearing considered the issue of the eviden-tiary support for such a claim. Likewise, there was no mention or discussion of the Castros’ “Motion for Leave to Amend Complaint to Assert a claim for Punitive Damages and Memorandum of Law” of April 21, 2009, which had been denied without prejudice September 9, 2009.[13]
The entire discussion at the April 29th hearing went to Defendants’ non-compliance with prior court directives. The court ultimately concluded “[ajecordingly, the Plaintiffs are entitled to the requests sought and the Defendants subject to the severest sanctions possible. The Court thus... [gjrants leave to the Plaintiffs and the complaint is hereby deemed amended by interlineation to include claims for punitive damages against the Defendants.” This does not comply with the procedural requirements of section 768.72. See Royal Caribbean Cruises, Ltd. v. Doe, 44 So.3d 230, 233 (Fla. 3d DCA 2010) (“Because there is no evidence in this record to suggest that the trial court made an evidentia-ry inquiry and/or factual determinations as *526 required by section 768.72, we grant RCCL’s petition and quash the trial court’s order granting the plaintiffs’ motion to amend their complaint to include a claim for punitive damages.”); Cypress Aviation, Inc. v. Bollea, 826 So.2d 1091, 1092 (Fla. 2d DCA 2002) (granting writ as trial court departed from the essential requirements of the law by allowing plaintiffs to proceed with claim for punitive damages without providing any evidentiary basis for their claim). We therefore quash that part of the order granting the Cast-ros’ motion to amend.
3. Striking U.S. Security’s and Ross’s pleadings, and entry of default
While “[d]eliberate and contumacious disregard of a court’s authority justifies application of the severe sanction of striking pleadings or entering default for noncompliance with a discovery order, as will bad faith, willful disregard or gross indifference to the court’s order, or conduct which evidences deliberate callousness[,] ... [a]nything short of this standard is an abuse of discretion.” Smith Original Homes, Inc. v. Carpet King Carpets, Inc., 896 So.2d 844, 847 (Fla. 2d DCA 2005); see also Mercer v. Raine, 443 So.2d 944, 946 (Fla.1983) (confirming that absent extreme circumstances, such as where a showing has been made of a deliberate and contumacious disregard for a court’s order or its authority, a party’s pleadings should not be stricken and a default entered). Thus, where sanctions such as these are being imposed for purportedly deliberate and contumacious conduct, the record must reflect a “refusal to obey” not just an inability to comply or confusion as to how to comply. Mittleman v. Rowe Int’l, Inc., 511 So.2d 766, 768 (Fla. 4th DCA 1987); Garden-Aire Village Sea Haven, Inc. v. Decker, 433 So.2d 676, 678 (Fla. 4th DCA 1983) (“When failure to comply with a court order is due to confusion or inability rather than gross indifference, a default ... should not be entered against the noncomplying party.”).
In this case, the record does not reflect that U.S. Security and Ross “refused to obey” the court’s directives. To the contrary, these parties’ repeatedly attempted to comply with the trial court’s directives until finally in June of 2011 Judge Cohen Lando ordered an evidentiary hearing to determine whether they were able to comply. As of that date, no findings of refusal to comply had been made.
At the subsequently held evidentiary hearing ordered by Judge Cohen Lando but conducted by Judge Platzer, the loss prevention officers for both U.S. Security and Ross appeared and testified under oath. Both representatives testified that they had no further ability to comply with the Castros’ demands.
Yet based on no more than the trial court’s “assumption” that because Ross was a large national concern, it had to be keeping more apprehension records than it claimed to have, and on the Castros’ counsel’s argument that it was just “logical” that these entities had to have more documents, the court below concluded that these parties had either destroyed documents or intentionally failed to produce them and held them in contempt and ordered a spoliation instruction to be given at trial. Using these determinations as a springboard, the court below, in its subsequent May 3rd order, struck the parties’ pleadings and entered a default against them. This is legally insufficient.
Because the record does not demonstrate that by the time of the May 3rd order, the documents the Castros sought currently existed or for that matter ever existed, there was no basis for the trial court’s determination that U.S. Security and Ross had “refused to obey” the court’s *527 prior directive. The order striking U.S. Security’s and Ross’s pleadings and entering default against them for “refusal to obey” must therefore be quashed.[14]
4. The remainder of the sanctions imposed against U.S. Security and Ross
On the above analysis, we quash the remainder of the sanctions orders imposing fees and costs against U.S. Security and Ross for their purportedly contumacious behavior.
This is a simple straight forward action about only one thing: whether the Defendants’ actions supported the Castros’ claims for false imprisonment, malicious prosecution, and slander. It is not about whether U.S. Security and Ross are good record keepers. As this court in Zayres Department Stores v. Fingerhut, 383 So.2d 262, 265 (Fla. 3d DCA 1980), confirmed, discovery in a false imprisonment, malicious prosecution action about other arrests or apprehensions similar to the one at issue is of such limited value as to make sanctions for the failure to provide such information virtually superfluous:
The requested information as to prior such cases or experiences of Zayres, occurring at other times and under other facts and circumstances, would have been of little substantial value or materiality to the plaintiff. For such other prior cases, if there were any, to be of material assistance to plaintiff, the establishment of their materiality, if any, would necessitate the equivalent of a collateral trial thereof.
(Citations omitted).
The same reasoning applies here.
In short, the record does not support the numerous scandalous accusations repeatedly asserted by the Castros against U.S. Security and Ross. Soca was never a party in this action. The unrefuted evidence was that Ross did not keep any apprehension reports at all. U.S. Security turned over the reports it had after the parties’ claims of work product privilege were resolved and as those reports were located. This left the hypothesized hundreds of yet outstanding reports with no evidentiary basis but Soca’s comment. The Castros nonetheless went on a five year quest to acquire these documents, and the failure to produce these documents did not justify the draconian sanctions imposed on U.S. Security and Ross or to obligate them to pay for this fruitless hunt.
As the Florida Supreme Court has said, “it is essential that we keep in mind the *528 purpose of discovery. Pretrial discovery was implemented to simplify the issues in a case, to eliminate the element of surprise, to encourage the settlement of cases, to avoid costly litigation, and to achieve a balanced search for the truth to ensure a fair trial.” Elkins v. Syken, 672 So.2d 517, 522 (Fla.1996). In this case, discovery pursued by the Castros accomplished none of these goals. It also bears repeating that a constant chant by an attorney of fraud, misrepresentation, bad faith, and other wrongdoing does not make it so, no matter how often and how loudly the refrain is repeated.
For all of the above reasons, the May 3, 2013 order is quashed in its entirety including the earlier orders granting fees and ordering a spoliation instruction and the matter is remanded to proceed to trial.

. U.S. Security was not named in the initial complaint, but thereafter added.

. For example, in response to the Castros' request for the "[ejntire personnel file of all employees/agents involved in the arrest and/or detention of the Plaintiff,” Ross responded: "Ross is unable to identify any employees involved in this matter; it was handled by Victor Soca who was employed by non-party, U.S. Security.”

. As previously stated, at the time of the incident, U.S. Security had been providing security for this Ross store for only some forty-five days.

. This order was not reduced to writing until August 17, 2009.

. This is baseless. Rule 1.280(c), generally authorizes a party to seek protection from a discovery request made to a non-party in an action where the items sought belong to the party. Fla. R. Civ. P. 1.280(c) ("Protective Orders. Upon motion by a party or by the person from whom discovery is sought ... the court in which the action is pending may make any order to protect a party or person"); see Engel v. Rigot, 434 So.2d 954, 957 (Fla. 3d DCA 1983) (Pearson, J., concurring) ("It is apodictic that one who is a party has no standing to object to a subpoena issued to a non-party witness unless that subpoena asks for documents in which the party claims some personal right or privilege or asks for documents in the party’s possession.”) (Emphasis added).

. Soca testified at his deposition on October 22, 2008, that his current address was 2434 Southwest Third Street, Miami, Florida. There is no showing here that this was not his address at that time or that U.S. Security or Ross knew otherwise.

. Nothing precludes the attorney for a corporate party from representing a non-party corporate employee subpoenaed to testify. Based on the assertion of the work product privilege by U.S. Security and Ross as to documents in Soca’s possession, no impropriety arises from advising Soca not to produce documents until motions for protective orders relating to those documents had been resolved.

. This accusation is completely inaccurate; the reports listed were for apprehensions not slip and falls.

. To the contrary, the deposition lays out in excruciating detail an attempt by the Castros to steal merchandise.

. U.S. Security also pointed out that portion of the August 5, 2010 transcript where the trial court acknowledged that the incident 'reports from a local grocery store were not related to slip and falls but were indeed apprehension reports.

. This number is consistent with Soca's record of the number of apprehensions he was actually making while working at both Publix and the Miracle Mile Ross. The document log provided for all apprehension reports made by Soca over a four year period shows that he made fewer than two apprehensions per week.

. Florida Rule of Civil Procedure 1.190(f), likewise provides:

. The Castros had also filed an April 21, 2011 “Motion for Contempt and Severe Sanctions,” which included a request for leave to amend to include a claim punitive damages in their complaint. A prior judge’s August 28, 2012 order had ruled only that the Castros could revise that request for the court’s subsequent consideration.

. This analysis necessarily nullifies the trial court’s earlier order granting a spoliation instruction:
In order for a court to effect any sort of remedy for a party's alleged spoliation of evidence, the court must determine whether: (1) "the evidence existed at one time,” (2) "the spoliator had a duty to preserve the evidence, and” (3) "the evidence was crucial to the opposing party['s] being able to prove its prima facie case or a defense.” Golden Yachts, Inc. v. Hall, 920 So.2d 777, 781 (Fla. 4th DCA 2006) (citing Jordan ex rel. Shealey v. Masters, 821 So.2d 342, 347 (Fla. 4th DCA 2002)).
Osmulski v. Oldsmar Fine Wine, Inc., 93 So.3d 389, 392 (Fla. 2d DCA 2012); see also Jones v. Publix Super Markets, Inc., 114 So.3d 998, 1005 (Fla. 5th DCA 2012) (concluding that although the “unexplained lack of any surveillance video” was suspicious, especially after the defendant had initially stated one did exist, there were not enough facts to conclude the defendant "caused [it] to disappear” so as to support a spoliation instruction).
In this case, and despite Soca's never supported claim that many apprehensions were made each day, no evidence exists that this occurred or that documents evidencing it ever existed. There also has never been a finding that U.S. Security or Ross had a duty to preserve any such documents or a showing that absent these documents the Castros will not be able to adduce prima facie evidence to support their defense.